IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
WEST VIRGINIA
(MARTINSBURG DIVISION)

**FILED**

AUG 2 1 2025

U.S. DISTRICT COURT- WVND
MARTINSBURG, WV 25401

| | |
|---|---|
| **William Whittman,** 15 New Plum Tree Charles Town, WV 25414 *Plaintiff)* v. **PENN Entertainment, inc.,** 825 Berkshire Blvd., Wyomissing, PA 19610 **PNGI Charles Town Gaming LLC** *DBA Hollywood Casino at Charles Town Races* 750 Hollywood Dr, Charles Town, WV 25414 *Defendants* | Civil Action No.: 3:25 CV 126 **Jury Trial Demanded** |

## COMPLAINT

Plaintiff, William Whittman, pro se, respectfully submits this Complaint seeking actual

damages, punitive damages, and declaratory relief for unlawful and malicious retaliation in

violation of 42 U.S.C. § 1981, with jurisdiction properly invoked under 28 U.S.C. § 1331, and

states as follows.

1. Defendants engaged in unlawful and malicious retaliation, giving rise to 2 solid counts

of unlawful retaliation—on July 23, 2025 and August 6, 2025—intentionally punishing Plaintiff

for protected legal activity and seeking to chill the judicial process, despite knowing such

conduct was unlawful retaliatory acts prohibited by federal and state law.

2. Defendants engaged in unlawful and malicious retaliation—on July 23 and August 6,

2025—intentionally punishing Plaintiff for protected legal activity and seeking to chill the

judicial process, despite knowing such conduct is prohibited under 42 U.S.C. § 1981, as well as

under West Virginia's Human Rights Act, which prohibits retaliatory interference with civil

rights."

**3.** Defendants' unlawful and malicious retaliatory acts give rise to:

1. Two claims of retaliation in violation of 42 U.S.C. § 1981 and First Amendment retaliation actionable under 42 U.S.C. § 1983;
2. Common law retaliatory interference with civil rights under West Virginia law;
3. Malicious use of a statutory process; and
4. Emotional distress, including harm reasonably foreseeable from Defendants' negligent disregard for Plaintiff's rights, well-being, reputation, and dignity.

4. Plaintiff seeks, for his harm and damages as a direct and proximate result of Defendants' unlawful retaliatory acts: (a) actual compensatory damages for economic losses—including travel, lodging, meals, lost membership benefits, and related expenses—estimated at $15,000–$25,000; (b) compensatory damages for emotional distress, humiliation, reputational harm, loss of dignity, and disruption of routine, reasonably valued at $75,000–$150,000 under 42 U.S.C. §§ 1981, 1983, Title II, and West Virginia law; (c) punitive damages for each count in an amount up to four times compensatory damages or $500,000, whichever is greater, pursuant to W. Va. Code § 55-7-6 and applicable federal standards, to punish and deter malicious retaliation—or, in the alternative, such amount as the jury finds right and just; and (d) declaratory and injunctive relief declaring the July 23, 2025 and August 6, 2025 exclusions void and enjoining Defendants from further retaliation or denial of access in violation of Plaintiff's rights.

5. While all malicious and retaliatory acts causing Plaintiff's harm and damages occurred in, and were carried out solely by, *PNGI Charles Town Gaming LLC ("Charles Town location"),* and while Plaintiff has never encountered such misconduct at any other property owned, managed, or operated by *PENN Entertainment, Inc.,* Plaintiff nonetheless holds *PENN Entertainment, Inc.* fully liable as a matter of law for the acts of its Charles Town location.

6. Plaintiff makes clear to the Court that, notwithstanding the unlawful and vindictive

treatment he has suffered from the Charles Town property, he holds the utmost respect and admiration for the Hollywood Casino brand and for PENN Entertainment, Inc., which owns, manages, or operates numerous locations Plaintiff has frequented without incident.

7. And yet with not a slight feelings of animosity for this defendant, the parent company, PENN Entertainment, Inc. at least to this point, PENN Entertainment, Inc is ultimately responsibility as a matter of law to ensure that all of its properties uphold the law, honor patrons' rights, and protect the company's reputation, including here to prevent any single location—or any group of vindictive officials or attorneys it or its locations employ—from engaging in unlawful, malicious, and retaliatory conduct that harms patrons and undermines the standards of the PENN Entertainment brand.

8. By permitting the Charles Town location to operate under its name while engaging in conduct that violates state and federal law, PENN Entertainment, Inc. bears both direct and vicarious liability for the acts committed against Plaintiff.

## I. JURISDICTION AND VENUE

9. This Court has jurisdiction under *28 U.S.C. § 1331* because this action arises under federal law, including Plaintiff's constitutional rights to free speech and access to the courts under the First and Fourteenth Amendments, and *42 U.S.C. § 1981,* which expressly prohibits the type of malicious retaliation at issue here — namely, two consecutive bans issued by Defendants in direct response to Plaintiff's protected legal actions.

10. The Court has supplemental jurisdiction under *28 U.S.C. § 1367* over Plaintiff's state-law claims because they are part of the same continuous course of retaliatory conduct and arise from the same nucleus of operative facts as the federal claims.

11. Venue is proper under *28 U.S.C. § 1391*(b)(2) because the retaliatory acts and other unlawful conduct alleged herein occurred primarily in Jefferson County, West Virginia, where Defendants operate and where the harm to Plaintiff was inflicted.

## II. PARTIES

12. ***Plaintiff William Whittman*** is an individual residing at 15 New Plum Tree, Charles Town, West Virginia 25414.

13. ***Defendant Penn Entertainment, Inc.*** is a Pennsylvania corporation with its principal office located at 825 Berkshire Blvd., Wyomissing, PA 19610. Penn Entertainment owns and controls multiple casinos throughout the United States, including the Hollywood Casino at Charles Town Races. It may be served via its registered agent:

> *CT Corporation System*
> *600 N. 2nd Street, Suite 401*
> *Harrisburg, PA 17101.*

14. ***Defendant PNGI Charles Town Gaming, LLC***, d/b/a Hollywood Casino at Charles Town Races, (*hereafter HCCTR*) is a Delaware limited liability company registered to do business in West Virginia, with its principal address at 750 Hollywood Drive, Charles Town, WV 25414. It may be served through its West Virginia registered agent:

CT Corporation System

> *5400 D Big Tyler Road*
> *Charleston, WV 25313.*

## III. STATEMENT OF FACTS

15. Plaintiff William Whittman is a resident of Charles Town, West Virginia, and a longtime member and patron of Hollywood Casino at Charles Town Races ("HCCTR").

16. For mail reliability, Plaintiff uses his office address at 701 W. Broad Street, Suite 205, Falls Church, Virginia 22046, because his son's mental-health challenges sometimes misplacing incoming mail.

17. Plaintiff previously lived in Fairfax County, Virginia, but due to frequent visits to HCCTR he relocated in summer 2024 to *15 New Plum Tree, Charles Town, West Virginia 25414*.

18. On July 20, 2024, during that relocation period, an incident occurred with another patron that led HCCTR to eject Plaintiff for one year.

19. The other patron was known to casino staff for repeatedly engaging in aggressive conduct toward patrons—particularly elderly individuals and women—by rushing toward, pushing past, or obstructing them as they attempted to settle into available slot machines, whereas Plaintiff has never had any incident of any kind at this or any other Hollywood Casino he has ever visited.

20. On July 20, 2024, a female patron was playing a slot machine next to Plaintiff.

21. Plaintiff told her that if she decided to leave, he was interested in playing that machine.

22. When she finished playing, she told Plaintiff she was done and asked if he still wanted it.

23. Plaintiff confirmed that he did and began printing his voucher ticket from his own machine to move to hers.

24. The woman remained next to the machine she had stopped playing but had not yet abandoned, holding it for Plaintiff until he came to take the seat.

25. It was a busy weekend, with many patrons waiting for slot machines.

26. Before Plaintiff could reach the seat, a Chinese patron who had been lingering nearby and watching for the woman to leave suddenly rushed toward her machine.

27. This patron attempted to snatch the machine from the woman, even though she was still standing next to it and had not abandoned it.

28. The woman told the other patron that she had not left and was holding the machine for Plaintiff.

29. The other patron ignored her, as he had repeatedly done with other vulnerable elderly patrons and women in the casino, and aggressively tried to take the seat by force.

30. Although Plaintiff initially approached intending to play the slot machine, his focus shifted entirely when he saw the other patron rushing toward and physically encroaching upon a female patron; recalling a similar prior incident involving his friend Jonina and the same individual, Plaintiff acted to intervene—pushing the aggressor away from the woman and the machine she had not yet vacated.

31. The other patron fell dramatically, not because of the push, but in a cowardly and staged manner to create a scene and portray Plaintiff as the aggressor.

32. Plaintiff then returned to his own machine to print the voucher he had not yet had time to retrieve, having been interrupted by the other patron's aggressive attempt to take the machine from the woman.

33. While Plaintiff was printing his slot ticket, the other patron rushed again toward the machine, and Plaintiff pushed him a second time.

34. Security and staff arrived and several patrons — including the woman — voluntarily told them that Plaintiff was not at fault.

35. A plainclothes staff member, recognizing the other patron from prior incidents, remarked, *"You again?"*

36. The other patron was well known to casino staff for repeated misconduct, yet was shielded from consequences because he was a high roller — with the casino putting profit ahead of the safety and security of its patrons

37. Security requested players' cards — not photo IDs — from both Plaintiff and the other patron, knowing the cards reveal each patron's spending level, a factor this casino has routinely used to shield this particular individual in similar situations while, in doing so, shifting blame onto his victims — usually elderly patrons in wheelchairs — for his aggressive acts of snatching machines from them

38. Immediately after receiving the players' cards and seeing which of the two spent more money in the casino, security abruptly told the surrounding patrons — who had voluntarily come forward to say Plaintiff was not at fault, none of whom

knew him but had witnessed the truth — that the investigation was over because plaintiff pushed him and ordered Plaintiff to leave immediately.

39. Plaintiff left the casino expecting that the other patron—known for repeated aggressive conduct and identified by multiple witnesses as solely at fault—would also be removed, at least pending a thorough investigation.

40. Plaintiff was informed by several friends, including Chinese patrons familiar with both him and the other individual, that the other patron was not disciplined for even an hour and, instead, was allowed to continue playing the very machine he had tried to take by force from the female patron—leading to the incident for which only Plaintiff was punished, a decision based solely on the disparity in each patron's spending at the casino.

41. On July 20, 2024, HCCTR issued a Notice of Ejection, followed by a written notice dated July 30, 2024, each reflecting a one-year ejection *(see Defendant's Exhibit A), produced by Defendants in separate state court litigation over this matter***).**

42. Plaintiff fully complied with the one-year ejection, though he did not remain silent about the fact that the other patron — the true instigator — was not disciplined even for an hour, due to the establishment's unlawful preferential treatment, which defamed Plaintiff and harmed him by portraying him as the sole troublemaker on false and improper grounds.

43. For these reasons, Plaintiff filed a lawsuit against Defendant HCCTR in the Circuit Court of Jefferson County, West Virginia *(Case No. CC-19-2024-C-156),*

asserting claims *for Unfair Business Practices, Defamation, Negligent Infliction of Emotional Distress, Breach of Duty, and Retaliation* — a case that remains active and pending.

44. During the one-year ban, Plaintiff frequented other Penn Entertainment casinos — including Hollywood Casino York and Hollywood Casino Grantville in Pennsylvania, and Hollywood Casino Perryville in Maryland — without any incidents or disciplinary action.

45. Plaintiff remained in good standing at all those other properties and continued to receive routine comps and offers.

46. During the one-year ban, Plaintiff requested early termination of the ban, citing that the real instigator had not been disciplined, that Plaintiff had no prior incidents at HCCTR, and that he had continued to frequent other Penn Entertainment casinos during the ban — where he was liked and respected by both guests and employees and had an exemplary record.

47. The casino refused Plaintiff's request in retaliation for his lawsuit, insisting that he could only reapply for reinstatement of membership after the one-year ban expired.

48. Plaintiff consistently responded that, once the ban ended, he would need no such request to enter a public accommodation and would not submit one, as entry into the casino does not require membership status.

49. On July 19, 2025, upon the official expiration of the one-year ban, Plaintiff served HCCTR Security with a *Notice of Lawful Return* stating he would return on July

20, 2025, at 12:01 a.m., and that same day filed a Motion for Declaratory Relief in the Jefferson County Circuit Court *(Plaintiff's Ex. A)* to preempt any attempt by Defendants to treat the expired ban as active and arrest or evict him under false pretenses in retaliation for his lawsuit.

50. Plaintiff, as he had notified them in his *Notice of Lawful Return,* reentered the casino on the exact date and time specified, freely participating in all activities of his choice without interference from July 19 through July 26, 2025.

51. Plaintiff entered and exited the casino multiple times each day and night—often four or more times—due to his residence immediately adjacent to the property

52. Numerous *slot machine ticket vouchers* and *food receipts* from casino restaurants, purchased using Plaintiff's membership card and accompanied by presentation of his ID without incident, document his open and continuous presence during this period. *(See Plaintiff's Exhibit A).*

53. Plaintiff was never stopped or approached by any security or staff to tell him to leave, as the ban had officially expired on July 19, 2025, and there was no longer any legal ban to enforce.

54. But all of this changed when PNGI, acting through its legal counsel, issued a *second retaliatory ban on July 23, 2025* — falsely labeled as an "extension" of a ban that had already expired and no longer existed to be extended — which Plaintiff did not receive until July 28, 2025.

55. In this second retaliatory ban Defendant — without citing any authority and while knowing full well that Plaintiff never submitted any request after the ban expired and had expressly informed them that no request was needed or would be made — falsely treated Plaintiff's *Notice of Lawful Return*, after the ban expired, as a *"request"* for reinstatement simply because they chose to label it as such, in order to conceal their malicious and unlawful act of retaliation for Plaintiff's lawsuit, a protected activity under the *First Amendment to the United States Constitution* and *42 U.S.C. § 1981 et seq.* guaranteeing the right to petition the government for redress of grievances and *equal access to public accommodations without retaliation.*

56. In this July 23, 2025 *Second Retaliatory Ban* —issued nearly a week after the original one-year ban had expired, and after nearly a week of Plaintiff's open and lawful return—Defendant expressly stated: *"PNGI Charles Town Gaming, LLC d/b/a Hollywood Casino at Charles Town Races (HCCTR) has considered your July 18, 2025 email as your written request…for reinstatement of your privileges to enter its Casino and Racetrack premises in Charles Town…"*

57. This letter was issued after Plaintiff had been lawfully present in the casino— day and night—entering multiple times per day, openly playing slot machines, purchasing food with his Hollywood Casino membership card, and presenting his ID for each transaction, all without a single objection from any staff or security **(See Plaintiff's Exhibit A**).

58. There was no incident involving Plaintiff at this casino — or at any other casino in Defendant's chain after the expiration of the one-year ban and his lawful return — to justify the second ban issued on July 23, 2025, except his pending state court lawsuit, a protected activity under the *First Amendment to the United States Constitution* and *42 U.S.C. § 1981 et seq.*

59. Rather than confront the undeniable fact that the original ban expired on July 19, 2025, and was never extended before that date — and could not lawfully be extended afterward — Defendant sought to disguise their malicious retaliatory act, undertaken in response to this lawsuit before the Jefferson County Circuit Court, by retroactively rebranding Plaintiff's *Notice of Lawful Return* as a "request" for reinstatement by their choice.

60. Upon receiving this second ban — *based on the same set of facts already used and exhausted to justify the first one-year ban that expired on July 19, 2025* — for their retaliatory action against his pending state court lawsuit, Plaintiff informed Defendants by email on August 1, 2025, that he would sue them in federal court under *42 U.S.C. § 1981* and *28 U.S.C. § 1331*

61. In a good-faith effort to resolve this dispute amicably outside of court, Plaintiff served Defendants (PNGI) via email on August 1, 2025, with a draft of this very complaint.

62. On August 6, 2025, in direct retaliation for Plaintiff's protected activity of seeking legal redress—and relying explicitly on allegations contained in this draft

complaint—Defendant issued a third retaliatory ban, this time permanent, marking an egregious and malicious escalation of its prior conduct. *(See Defendant's Exhibit A.)*

63. Defendant's decision to impose a third consecutive—and now permanent—ban only five days after being served with Plaintiff's federal draft complaint was not based on any newly discovered conduct, incident, or legitimate business need, but was taken solely in retaliation for Plaintiff's protected litigation activity and, by Defendant's own admission, for the deliberate use of Plaintiff's own pleadings against him. *(See Defendant's Exhibit A.)*

64. Defendant admitted in writing that it permanently banned Plaintiff on August 6, 2025, imposing harsher punishment because of statements he made in federal court—falsely twisting his draft complaint's allegation that Defendants rely on slot machines to foster addiction into a claim that he himself is an "addicted gambler"—a retaliatory act prohibited by federal and state anti-retaliation laws and by common law protecting individuals from punishment for exercising their legal rights.

65. The retaliatory nature of the Third Ban, issued on August 7, 2025 and made permanent, is underscored by: (a) the close temporal proximity—less than one week—between Plaintiff's service of the draft federal complaint and the issuance of this third consecutive ejection; (b) Defendant's explicit reliance on Plaintiff's litigation statements as the sole justification for the ban; and (c) the complete absence of any intervening incident, misconduct, or other legitimate basis for such action.

66. The August 7, 2025 letter stands as an independent, separate act of retaliation from the July 23, 2025 second ban and is actionable in its own right.

67. Defendants' retaliatory acts—the July 23, 2025 ban and the August 6, 2025 permanent ban—both of which arose from and now invoke a federal forum, constitute direct violations of Plaintiff's rights under *42 U.S.C. § 1981* and *the First and Fourteenth Amendments to the United States Constitution.*

68. With full knowledge of Plaintiff's pending state court lawsuit and intent to seek federal relief, Defendants deliberately committed two retaliatory acts—the July 23, 2025 ban and the August 6, 2025 permanent ban—for the sole purpose of punishing his protected activity, in willful violation of 42 U.S.C. § 1981 and the *First and Fourteenth Amendments to the United States Constitution.*

69. The U.S. Supreme Court has affirmed that *§ 1981* prohibits retaliation for engaging in protected activity. *CBOCS West, Inc. v. Humphries, 553 U.S. 442, 457 (2008).*

70. Federal appellate courts have likewise recognized that retaliatory conduct—especially when it targets access to legal processes or public accommodations—is actionable. *Arendale v. City of Memphis, 519 F.3d 587, 601 (6th Cir. 2008).*

71. Contrary to Defendant's malicious and arbitrary issuance of a third—now permanent—ban in retaliation for Plaintiff's draft federal complaint and expressly based on statements made therein, West Virginia law provides no authority for casinos to unilaterally ban patrons on the basis of suspected gambling problems or

speculative assumptions, making Defendant's action an unmistakable act of unlawful and malicious retaliation.

72. *The West Virginia Lottery Commission* is the sole authority authorized to oversee exclusion of persons with gambling addiction problems, and it does so only through the statewide *Self-Exclusion Program.*

73. Entry into the program requires the patron's voluntary submission of a notarized, written request to have their name placed on the exclusion list.

74. *This process cannot be initiated by the casino or by any third party.*

75. Participants remain excluded for at least one year, after which they may petition for removal—but again, only on their own initiative, not at the discretion of a casino. **(See wvlottery.com)**

76. Importantly, exclusion is a legal process—not a matter of discretionary, *ad-hoc casino policy.*

77. Attempting entry while self-excluded may lead to criminal trespass charges only because state law makes it illegal, not because a casino unilaterally decides to prohibit entry.

78. Contrary to the Defendant's vicious and unlawful retaliatory acts—especially the August 6, 2025 third consecutive ban—casino authority under West Virginia law is strictly limited and regulated, as § 29-22A-19 mandates that responsible gambling programs, including voluntary self-exclusion, must be patron-initiated and overseen by the *West Virginia Lottery Commission.*

79. Casinos in WV per WV law lack any statutory power to impose unilateral or speculative exclusions, rendering the Defendant's permanent ban both *procedurally void and a clear act of retaliation.*

80. Under *§ 29-22A-19* and related *Lottery Commission regulations,* only the Director—not the casino—may place a patron on an exclusion list for gambling problems, and *only upon that patron's written request,* making any casino-imposed "problem gambling" ban wholly *unauthorized and unlawful.*

81. The August 6 and 7, 2025 "permanent ejection(s)," issued solely under the guise of Defendant's alleged *"responsible gaming"* concerns, directly contradict *West Virginia's self-exclusion policy*—which requires the patron to initiate the process through the Lottery Commission under *W. Va. Code § 29-22A-19*—and therefore constitute unlawful and malicious retaliation.

82. Defendant's action was in direct violation of West Virginia's mandated self-exclusion protocols under *W. Va. Code § 29-22A-19,* thereby nullifying any pretense of good-faith compliance with responsible gaming standards.

83. The absence of any intervening incident or misconduct, coupled with Defendant's express reliance on statements from Plaintiff's federal complaint, demonstrates that the ban was purely retaliatory.

84. Defendant's August 7, 2025 action—citing "responsible gaming concerns" as a pretext—is under *West Virginia law (§ 29-22A-19),* both factually and legally inconsistent with West Virginia's statutory framework, and when coupled with its

timing and Defendant's own written admissions, leaves no doubt that the ban was malicious, unlawfully retaliatory, and improperly motivated.

## IV. LEGAL BASES

### COUNT I
### Retaliation for Protected Activity Related to Second Ban on July 23, 2025
### *(First & Fourteenth Amendments; 42 U.S.C. § 1981)*

Defendants' issuance of a second exclusion letter on July 23, 2025—falsely characterized as an "extension" of an already-expired one-year ban—was a retaliatory act in direct violation of Plaintiff's rights under the First and Fourteenth Amendments and 42 U.S.C. § 1981.

**1. Federal Recognition of Retaliation Claims Under § 1981**

The U.S. Supreme Court has confirmed that § 1981 prohibits retaliation against individuals who engage in protected activity. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008). Federal appellate courts have likewise held that retaliatory conduct—particularly when aimed at restricting access to legal processes or public accommodations—falls squarely within the statute's protections. *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008).

**2. Expired Ban Cannot Be "Extended"**

The first exclusion order expired by its own terms on July 20, 2025. Under law and plain logic, once the original ban lapsed, there was nothing left to "extend." Any new exclusion could only be a separate, independent act—subject to its own legal basis, due process considerations, and potential challenge.

By mislabeling the second ban as an "extension," Defendants attempted to bypass these requirements and create the false appearance of legal continuity. This maneuver deprived Plaintiff of procedural safeguards and masked the retaliatory nature of the exclusion.

### 3. Retaliatory Motive

The July 23, 2025 exclusion came directly after Plaintiff's filing of a lawsuit against Defendants and the exercise of his constitutional and statutory rights. The timing, absence of new factual justification, and false "extension" label collectively demonstrate that the second ban's true purpose was to punish Plaintiff for pursuing legal action.

### 4. Harm and Damages

As a direct and proximate result of Defendants' retaliation, Plaintiff has suffered:

- Reputational harm in the local community;
- Emotional distress;
- Economic losses from exclusion from a public venue; and
- A chilling effect on his willingness to pursue legal claims or return to public accommodations for which he has a legal right of access.

COUNT II
**Retaliation for Protected Activity Related to August 7, 2025 Ban**
*(West Virginia Code § 29-22A-19; First & Fourteenth Amendments; 42 U.S.C. § 1981)*

On August 7, 2025, Defendants issued yet another exclusion order—this time citing "responsible gaming concerns" as the stated reason. This justification is pretextual and inconsistent with both the facts and the governing legal framework, including West Virginia Code § 29-22A-19, which prescribes specific procedures and grounds for exclusion.

### 1. Statutory and Constitutional Violations

Under *§ 29-22A-19,* exclusion actions must be grounded in lawful cause and supported by due process. Defendants' own written admissions show no such cause existed. Instead, the timing—coming mere days after Plaintiff challenged the July 23, 2025 ban—demonstrates an unambiguous retaliatory motive.

The First and Fourteenth Amendments, together with *§ 1981*, prohibit retaliation for the exercise of legal rights, including filing lawsuits and seeking judicial relief. The August 7 action was designed to penalize Plaintiff for protected activity and to obstruct his access to public accommodations and the courts.

## 2. Evidence of Pretext

Defendants' reliance on "responsible gaming concerns" is contradicted by their prior conduct, their failure to initiate any responsible gaming interventions before litigation began, and their own admissions. The absence of any contemporaneous evidence of problematic gaming behavior—combined with the abrupt use of this rationale after Plaintiff's legal filings—confirms the explanation was manufactured after the fact.

## 3. Harm and Damages

As a direct and proximate result of the August 7, 2025 exclusion, Plaintiff has suffered:

- Further reputational damage;
- Intensified emotional distress;
- Ongoing economic harm from exclusion from a public venue; and
- Additional chilling effects on his willingness to assert his legal rights.

**COUNT III**
**Violation of Public Accommodation Rights**
*(West Virginia Human Rights Act and/or Title II of the Civil Rights Act)*

Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

Defendants operate Hollywood Casino at Charles Town Races, a facility open to the public and subject to federal and state public accommodation laws. Under Title II of the Civil Rights Act of 1964, all individuals are entitled to the *full and equal enjoyment* of the goods, services, facilities, privileges, and advantages of such places. See *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964) (holding that places of lodging and entertainment open to the public are covered public accommodations).

Similarly, West Virginia law prohibits unjustified denial of public access and forbids retaliation or interference with protected civil rights. See W. Va. Code R. § 77-1-7(a) (prohibiting any "refusal, denial, or interference with public accommodations").

Here, after the original one-year ban expired, Plaintiff lawfully returned to the casino. In direct retaliation for Plaintiff's protected legal activity—including filing a Motion for Declaratory Relief—Defendants issued a second exclusion notice, deliberately misrepresenting it as an "extension" of the expired ban. This retaliatory act constituted:

1. Unlawful denial of access to a place of public accommodation.
2. Interference with Plaintiff's civil rights under both federal and state law.
   As a direct and foreseeable result of this exclusion, Plaintiff suffered:
- Economic damages: loss of membership benefits, travel expenses, lodging costs, and lost promotional offers.
- Emotional damages: stress, humiliation, reputational harm, and mental anguish

Courts have consistently held that injunctive and declaratory relief are appropriate where a plaintiff faces repeated or likely future denial of access due to retaliation or discrimination—particularly where proximity, prior patronage, and intent to return are established. See *Gillespie v. Dimensions Health Corp.*, 369 F. Supp. 2d 636, 642 (D. Md. 2005).

Further, the U.S. Supreme Court has upheld the availability of declaratory and injunctive remedies under Title II even when criminal penalties could apply for conspiracies to deny access. See *United States v. Johnson*, 390 U.S. 563, 568–71 (1968).

Legal Authorities Applied to This Case:

- *Heart of Atlanta Motel*: Casinos are public accommodations under Title II.
- *Gillespie*: Establishes standing where plaintiff shows past use, proximity, and intent to return—facts present here.
- *United States v. Johnson*: Confirms injunctive and declaratory relief remain available despite potential criminal remedies.
- W. Va. Code R. § 77-1-7(a): Explicitly prohibits the kind of retaliatory denial and interference alleged here.

COUNT IV
**Negligent Infliction of Emotional Distress**
***(Recognized under West Virginia common law)***

Defendants owed Plaintiff a duty to refrain from reckless, harassing, or retaliatory conduct—particularly once Plaintiff exercised protected rights and initiated legal action.

Defendants breached that duty by:

1. Issuing a second exclusion based on expired facts.
2. Misrepresenting that exclusion as a lawful "extension."
3. Knowingly subjecting Plaintiff to reputational damage, humiliation, and severe emotional harm.
   This conduct was negligent and it was reasonably foreseeable that such actions would cause emotional distress to a regular patron and loyalty program member wrongfully excluded from the premises in retaliation for asserting his rights.
   As a direct and proximate result of Defendants' conduct, Plaintiff suffered:
- Anxiety, humiliation, and mental anguish.
- Damage to personal and professional reputation.

West Virginia law recognizes a cause of action for Negligent Infliction of Emotional Distress when emotional harm is a foreseeable consequence of a breach of duty, even without physical injury. See *Heldreth v. Marrs*, 188 W. Va. 481, 425 S.E.2d 157 (1992). This principle has been applied in both personal and commercial contexts where emotional distress is the natural and direct result of the defendant's conduct.

In this case, Defendants' retaliation—undertaken knowingly and without lawful basis—created precisely the type of foreseeable emotional harm recognized under West Virginia common law.

## V. DAMAGES

*A. Compensatory Damages:* Plaintiff seeks **$25,000** for actual economic losses, including travel, accommodations, meals, lost membership credits, and other out-of-pocket costs caused by Defendants' retaliatory exclusion—or, in the alternative, such sum as the jury finds fair and just.

*B. Emotional Distress Damages* Plaintiff seeks **$150,000** for emotional distress, including anxiety, humiliation, reputational harm, disruption of routine, and other mental suffering caused by Defendants' unlawful conduct—or, in the alternative, such sum as the jury finds fair and just.

*C. Punitive Damages:* Plaintiff seeks **$500,000** in punitive damages for **each of the counts** to punish and deter Defendants' willful, malicious, and retaliatory conduct—or, in the alternative, such sum as the jury finds fair and just.

*D. Declaratory Relief:* Plaintiff requests declaratory relief that:

- The second exclusion was unlawful, retaliatory, and not a valid extension of an expired ban.
- The exclusion is void and unenforceable under state and federal law.

Plaintiff also seeks injunctive relief to ensure immediate and ongoing lawful access to Hollywood Casino at Charles Town Races, without further retaliation.

**Why These Authorities Matter**

- *Heart of Atlanta Motel* establishes that casinos and similar entertainment facilities are public accommodations under Title II.
- *Gillespie* outlines standing requirements for relief under public accommodation law, directly applicable to your situation—given your proximity, frequent patronage, and plan to return.

- *United States v. Johnson* affirms the availability of declaratory and injunctive relief even where criminal enforcement exists, underscoring courts' openness to resolving wrongful exclusion claims.

WHEREFORE, Plaintiff respectfully prays that the Court adjudicate the following relief:

1. Declare that Defendants' retaliatory exclusion is unlawful and void.
2. Award compensatory damages for economic losses, emotional distress, reputational harm, and any other actual losses proximately caused by Defendants' wrongful conduct.
3. Award punitive damages sufficient to deter and punish Defendants for malicious, reckless, and retaliatory behavior.
4. Enter declaratory and injunctive relief restoring Plaintiff's lawful access to the casino.
5. Award pre- and post-judgment interest, costs of suit, and such further relief as justice requires.

**Respectfully submitted,**
William Whittman
15 New Plum Tree
Charles Town, WV 25414
(202) 391-5582
**Pro Se Plaintiff**

*William Whittman*